**Nos. 23-11157, 23-11199, 23-11203, 23-11204, 23-40685**

# In the United States Court of Appeals
## FOR THE FIFTH CIRCUIT

CASE NO. 23-11157

SECOND AMENDMENT FOUNDATION, INCORPORATED; RAINIER ARMS, L.L.C.;
SAMUEL WALLEY; WILLIAM GREEN,

*PLAINTIFFS-APPELLANTS*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; STEVEN DETTELBACH, *in his official capacity Director of the Bureau of Alcohol Tobacco Firearms and Explosives*; UNITED STATES DEPARTMENT OF THE JUSTICE; MERRICK GARLAND, U.S. ATTORNEY GENERAL

*DEFENDANT-APPELLEES*,

Consolidated with

*caption continued on following page*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS IN NOS. 3:21-CV-116, 4:23-CV-95, 2:23-CV-19, AND 4:23-CV-578; AND FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS IN NO. 6:23-CV-13

**RESPONSE BRIEF OF APPELLEES DARREN A. BRITTO, GABRIEL A. TAUSCHER, SHAWN M. KROLL, TEXAS GUN RIGHTS, INC., AND NATIONAL ASSOCIATION FOR GUN RIGHTS, INC. IN NOS. 23-11203 AND 23-11204**

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

Rick Esenberg
Daniel P. Lennington
Lucas T. Vebber
Skylar Croy
  *330 East Kilbourn Avenue*
  *Suite 725*
  *Milwaukee, WI 53202*

———————

CASE NO. 23-11199

———————

WILLIAM T. MOCK; CHRISTOPHER LEWIS; FIREARMS POLICY COALITION, INCORPORATED, *a nonprofit corporation*; MAXIM DEFENSE INDUSTRIES, L.L.C.,

*PLAINTIFFS-APPELLEES,*

v.

MERRICK GARLAND, U.S. ATTORNEY GENERAL, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE UNITED STATES; UNITED STATES DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; STEVEN DETTELBACH, *in his official capacity as the Director of the Bureau of Alcohol Tobacco Firearms and Explosives,*

*DEFENDANT-APPELLANTS,*

Consolidated with

———————

CASE NO. 23-11203

———————

DARREN A. BRITTO; GABRIEL A. TAUSCHER; SHAWN M. KROLL,

*PLAINTIFFS-APPELLEES,*

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

*DEFENDANT-APPELLANT,*

Consolidated with

---

CASE NO. 23-11204

---

TEXAS GUN RIGHTS, INCORPORATED; NATIONAL ASSOCIATION FOR GUN
RIGHTS, INCORPORATED,

*PLAINTIFFS-APPELLEES*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES,

*DEFENDANT-APPELLANT*,

Consolidated with

---

CASE NO. 23-40685

---

STATE OF TEXAS; GUN OWNERS OF AMERICA, INCORPORATED; GUN OWNERS
FOUNDATION; BRADY BROWN,

*PLAINTIFFS-APPELLEES*,

v.

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; UNITED
STATES DEPARTMENT OF JUSTICE; STEVEN M. DETTELBACH, *Director of
ATF*,

*DEFENDANT-APPELLANTS*

---

# CERTIFICATE OF INTERESTED PERSONS

Nos. 23-11157, 23-11199, 23-11203, 23-11204, 23-40685; *Second Amendment Found., Inc., et al. v. BATFE, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| | |
|---|---|
| **Plaintiffs-Appellants in No. 23-11157:** | William Green<br><br>Samuel Walley<br><br>Second Amendment Foundation, Inc.<br><br>Rainier Arms, LLC |
| **Counsel for Plaintiffs-Appellants in No. 23-11157:** | Chad Flores<br>FLORES LAW, PLLC |

| **Plaintiffs-Appellees in No. 23-11199:** | Christopher Lewis |
| | William T. Mock |
| | Firearms Policy Coalition, Inc. |
| | Maxim Defense Industries, LLC |
| **Counsel for Plaintiffs-Appellees in No. 23-11199:** | Bradley Benbrook<br>Stephen Duvernay<br>BENBROOK LAW GROUP, P.C. |
| | Richard Brent Cooper<br>Nathan Curtis Flanigin<br>COOPER & SCULLY, P.C. |
| | Cody J. Wisniewski<br>FIREARMS POLICY COALITION ACTION FOUNDATION |
| **Plaintiffs-Appellees in No. 23-11203:** | Darren A. Britto |
| | Shawn M. Kroll |
| | Gabriel A. Tauscher |

| | |
|---|---|
| **Counsel for Plaintiffs-Appellees in No. 23-11203:** | Richard M. Esenberg<br>Daniel Lennington<br>Lucas Vebber<br>Skylar Croy<br>WISCONSIN INSTITUTE FOR LAW & LIBERTY, INC.<br><br>Ed. J. McConnell<br>Jeffrey W. Tormey<br>TORMEY & McCONNELL, LLC |
| **Plaintiffs-Appellees in No. 23-11204:** | National Association for Gun Rights, Inc.<br><br>Texas Gun Rights, Inc. |
| **Counsel for Plaintiffs-Appellees in No. 23-11204:** | Barry K. Arrington<br>ARRINGTON LAW FIRM<br><br>Richard M. Esenberg<br>Daniel Lennington<br>Lucas Vebber<br>Skylar Croy<br>WISCONSIN INSTITUTE FOR LAW & LIBERTY, INC.<br><br>Jason C. Nash<br>THE LAW OFFICE OF JASON NASH, P.L.L.C. |

| | |
|---|---|
| **Plaintiffs-Appellees in No. 23-40685:** | Brady Brown<br><br>Gun Owners of America, Inc.<br><br>Gun Owners Foundation<br><br>State of Texas |
| **Counsel for Plaintiffs-Appellees in No. 23-40685:** | Ken Paxton<br>Brent Webster<br>Charles Kenneth Eldred<br>Kateland R. Jackson<br>Lanora Christine Pettit<br>OFFICE OF THE TEXAS ATTORNEY GENERAL<br><br>Anthony Roman Napolitano<br>BERGIN, FRAKES, SMALLEY & OBERHOLTZER, P.L.L.C.<br><br>Robert J. Olson<br>WILLIAM J. OLSON, P.C.<br><br>Stephen Dean Stamboulieh<br>STAMBOULIEH LAW, P.L.L.C. |

| | |
|---|---|
| **Defendants-Appellants in Nos. 23-11199, 23-11203, 23-11204, 23-40685 and**<br><br>**Defendants-Appellees in No. 23-11157:** | Steven Dettelbach (not a defendant in Nos. 23-11203 and 23-11204)<br><br>Bureau of Alcohol, Tobacco, Firearms, and Explosives<br><br>Merrick Garland (not a defendant in Nos. 23-11203, 23-11204, and 23-40685)<br><br>United States Department of Justice (not a defendant in Nos. 23-11203 and 23-11204) |
| **Counsel for Defendants-Appellants in Nos. 23-11199, 23-11203, 23-11204, 23-40685 and Defendants-Appellees in No. 23-11157:** | <u>Appellate Counsel</u><br>Abby C. Wright<br>Sean R. Janda<br>Ben Lewis<br>U.S. DEPARTMENT OF JUSTICE<br><br><u>Trial Counsel</u><br>Michael Drezner<br>Jody D. Lowenstein<br>Faith E. Lowry<br>Taylor Pitz<br>U.S. DEPARTMENT OF JUSTICE |

| | |
|---|---|
| **Amici Curiae in Support of Appellants in Nos. 23-11199, 23-11203, 23-11204, and 23-40685:** | Brady Center to Prevent Gun Violence<br><br>Giffords Law Center to Prevent Gun Violence<br><br>March For Our Lives Foundation<br><br>Everytown for Gun Safety Support Fund |
| **Counsel for Amici Curiae:** | Samuel I. Ferenc<br>Paul J. Fishman<br>ARNOLD & PORTER KAYE SCHOLER, L.L.P.<br><br>Eric Tirschwell<br>Aaron Esty<br>EVERYTOWN LAW<br><br>Esther Sanchez-Gomez<br>Kelly M. Percival<br>GIFFORD LAW CENTER TO PREVENT GUN VIOLENCE<br><br>Ciara Wren Malone<br>MARCH FOR OUR LIVES<br><br>Douglas N. Letter<br>Shira Laruen Feldman<br>Jenna Klein<br>BRADY CENTER TO PREVENT GUN VIOLENCE |

| | |
|---|---|
| **Amicus Curiae in Support of Plaintiffs-Appellants in Nos. 23-11157 and**<br><br>**Plaintiffs-Appellees in Nos. 23-11199, 23-11203, 23-11204, and 23-40685:** | Texas Public Policy Foundation |
| **Counsel for Amicus Curiae:** | Robert E. Henneke<br>Chance Weldon<br>Clayton Way Calvin<br>Matthew R. Miller<br>TEXAS PUBLIC POLICY FOUNDATION |

*/s/ Skylar Croy*
Skylar Croy
   *Attorney of Record for Darren A. Britto, Gabriel A. Tauscher, Shawn M. Kroll, Texas Gun Rights, Inc., and National Association for Gun Rights, Inc.*
WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

## STATEMENT REGARDING ORAL ARGUMENT

These appeals could affect millions of people; accordingly, oral argument is appropriate and requested.

# TABLE OF CONTENTS

STATEMENT OF THE ISSUES.................................................1

STATEMENT OF THE CASES .............................................. 2

SUMMARY OF THE ARGUMENT ....................................... 18

STANDARD OF REVIEW.................................................. 19

ARGUMENT ................................................................. 21

  I. The three veterans and the two associations are likely to succeed on the merits. ................................................... 22

    A. The new rule is unconstitutional. ........................... 22

      i. The new rule violates the Second Amendment because it reaches conduct covered by the Amendment's plain text and lacks a historical analogue. ................................... 23

      ii. Alternatively, the new rule violates the Second Amendment because pistols with a stabilizing brace are in common use by law-abiding citizens. ............................... 34

      iii.The new rule violates the Fifth Amendment because it is vague.............................................................. 37

      iv.If the Bureau has been statutorily authorized to promulgate the new rule, the statute is an unconstitutional delegation of legislative power to the executive. ............................................................. 40

    B. The new rule is invalid on numerous statutory grounds.......... 43

      i. The Bureau did not comply with the notice requirement of the Administrative Procedures Act in promulgating the new rule......................................................... 43

      ii. The new rule conflicts with the statutory definition of "rifle."..................................................................... 46

      iii.The new rule violates the Administrative Procedure Act because it is arbitrary and capricious.................................. 51

II. Equity weighs in favor of relief. ...................................................... 54

    A. The three veterans and two associations will suffer irreparable harm. ...................................................... 54

    B. The district court correctly balanced the public interest and harms. ...................................................... 57

III. The district court in *Britto* appropriately exercised its discretion by issuing a stay. ...................................................... 58

IV. In *Texas Gun Rights*, the district court appropriately exercised its discretion. ...................................................... 64

CONCLUSION ...................................................... 64

CERTIFICATE OF SERVICE ...................................................... 66

CERTIFICATE OF COMPLIANCE ...................................................... 67

# TABLE OF AUTHORITIES

## Cases

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495
(1935) ........................................................................ 41

*Advoc. Health Care Network v. Stapleton*, 581 U.S. 468 (2017)............ 47

*All. for Hippocratic Med. v. FDA*, 78 F.4th 210 (5th Cir. 2023),
*cert. granted on other grounds sub. nom.*, *Danco Lab'ys, LLC
v. All. for Hippocratic Med.*, 144 S. Ct. 537 .......................... passim

*Barnett v. Raoul*, 2024 WL 756161 (S.D. Ill. Feb. 23, 2024) ................. 25

*Bickford v. Int'l Speedway Corp.*, 654 F.2d 1028 (5th Cir. 1981) ........... 18

*Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754
F.3d 272 (5th Cir. 2014) ................................................. 19

*Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667 (1986) ............ 49

*Britto v. Bureau*, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023) 1, 16, 44, 55

*Brown v. Bd. of Ed.*, 349 U.S. 294 (1955) ............................... 60

*BST Holdings, LLC v. OSHA*, 17 F.4th 604 (5th Cir. 2021) ................. 21

*Byrum v. Landreth*, 566 F.3d 442 (5th Cir. 2009) ....................... 20

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)............................. 34, 35

*Cardoso v. Reno*, 216 F.3d 512 (5th Cir. 2000) ......................... 18, 19

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), *cert. granted sub
nom.*, *Garland v. Cargill*, 144 S. Ct. 374 ............................. 50, 59

*Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627 (5th
Cir. 2023) ............................................................... 21

*Clay v. Sun Ins. Off. Ltd.*, 363 U.S. 207 (1960) ....................... 43

*Davis v. E. Baton Rouge Parish Sch. Bd.*, 721 F.2d 1425 (5th Cir.
1983) .................................................................... 60

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ................. 52

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................... passim

*Drummond v. Robinson*, 9 F.4th 217 (3d Cir. 2021) ....................... 18, 24

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................................................... 21

*ExxonMobil Pipeline Co. v. DOT*, 867 F.3d 564 (5th Cir. 2017) ............. 52

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ........................... 27

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) .............. 37, 38

*Garcia v. Jones*, 910 F.3d 188 (5th Cir. 2018) ...................................... 20

*Gill v. Whitford*, 585 U.S. 48 (2018) ..................................................... 62

*Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1 (2023) ................................ 58

*Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936) .................................... 29

*Hodgson v. First Fed. Sav. & Loan Ass'n of Broward Cnty.*, 455 F.2d 818 (5th Cir. 1972) ....................................................................... 58

*Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254 (5th Cir. 2001) ......... 19

*Indus. Union Dep't, AFL-CIO v. Am. Petro. Inst.*, 448 U.S. 607 (1980) ........................................................................................................ 49

*Jacobellis v. Ohio*, 378 U.S. 184 (1964) ................................................. 40

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), *cert. granted sub nom.*, *SEC v. Jarkesy*, 143 S. Ct. 2688 (2023) .................. 41, 42, 43

*Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish*, 849 F.3d 615 (5th Cir. 2017) ....................................................................... 22

*Johnson v. United States*, 576 U.S. 591 (2015)....................................... 38

*Kolender v. Lawson*, 461 U.S. 352 (1983) ........................................ 38, 40

*League of Women Voters of the U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................................................................................................. 57

*Lemon v. Kurtzman*, 411 U.S. 192 (1973) ........................................ 60, 61

*Lewis v. Casey*, 518 U.S. 343 (1996)................................................. 62, 63

*Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478 (W.D. La. 2022) ..................................................... 21

*Maloney v. Singas*, 351 F. Supp. 3d 222 (E.D.N.Y. 2018) ..................... 35

*Milliken v. Bradley*, 418 U.S. 717 (1974) ........................................ 60, 61

*Milliken v. Bradley*, 433 U.S. 267 (1977) ......................................... 60, 61

*Mistretta v. United States*, 488 U.S. 361 (1989) ..................................... 41

*Mock v. Garland*, 2023 WL 6457920 (N.D. Tex. Oct. 2, 2023) .. 16, 34, 35, 54

*Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023)............................. 1, 4, 6, 7

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).................. 62

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) . 18, 23, 24, 29

*Nken v. Holder*, 556 U.S. 418 (2009)................................................ 21, 62

*Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012) ..................................................................................... 21

*Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935) .............................. 42

*R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182 (5th Cir. 2023)............. 52

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)................................... 47

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), *vacated & reh'g granted*, 93 F.4th 1150 (2024) ...................................................... 37

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368 (5th Cir. 2021) ................................................................. 44

*Tex. Gun Rights, Inc. v. Bureau*, 2023 WL 8352316 (N.D. Tex. Oct. 4, 2023) ...................................................................... 2, 17, 45, 52

*Texas v. Biden*, 10 F.4th 538 (5th Cir. 2021) ...................................... 57

*Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) ............................ 59

*United States v. Comeaux*, 2024 WL 115929 (W.D. La. Jan. 10, 2024) ............................................................................................. 25

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688......................................................... 24, 33

*United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020) ............... 45, 46

*United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992). 50, 51

*United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485 (5th Cir. 2014) ............................................................... 46

*United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) .................................................................................... 59

*VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023) ..........................50

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002) ........................................................................29

*Webster v. Doe*, 486 U.S. 592 (1988)........................................................48

*West Virginia v. EPA*, 597 U.S. 697 (2022).............................................49

*Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*, 80 F.4th 536
    (5th Cir. 2023) ......................................................................... 19, 20

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)..........................49

*Yates v. United States*, 574 U.S. 528 (2015)............................................47

**Statutes**

1631 Va. Acts 174, Acts of Feb. 24, 1631, Act LVI,
    https://firearmslaw.duke.edu/laws/1631-va-acts-174-acts-of-
    february-24th-1631-act-lvi ...........................................................30

1814 Mass. Acts 464, ch. 192,
    https://firearmslaw.duke.edu/laws/1814-mass-acts-464-an-
    act-in-addition-to-an-act-entitled-an-act-to-provide-for-the-
    proof-of-fire-arms-manufactured-within-this-commonwealth-
    ch-192-c2a7-1...............................................................................32

1866 Ga. Laws 27–28, https://firearmslaw.duke.edu/laws/1866-ga-
    laws-27-28-an-act-to-authorize-the-justices-of-the-inferior-
    courts-of-camden-glynn-and-effingham-counties-to-levy-a-
    special-tax-for-county-purposes-and-to-regulate-the-same-
    c2a7c2a7-3 ....................................................................................33

26 U.S.C. § 5811 ...........................................................................................6

26 U.S.C. § 5841 ...........................................................................................6

26 U.S.C. § 5845 ................................................................................. passim

26 U.S.C. § 5871 ...........................................................................................7

5 U.S.C. § 705 ................................................................................. 2, 58, 64

5 U.S.C. § 706 ...........................................................................................52, 58

*Laws of the Commonwealth of Massachusetts from November 28,*
    *1780 to February 28* (1807),
    https://www.google.com/books/edition/The_Laws_of_the_Com

monwealth_of_Massachu/px8wAAAAYAAJ?hl=en&gbpv=1&pg=PP5&printsec=frontcover ..........................................31

**Other Authorities**

1 *A New and Complete Law Dictionary* (1771) ...........................23, 24, 26

86 Fed. Reg. 30,826-01 (June 10, 2021) .....................................2

88 Fed. Reg. 6478 (Jan. 31, 2023) ................................. passim

Adrian Vermeule, *No*, 93 Tex. L. Rev. 1547 (2015) ................................42

Bureau, *Firearms Commence in the United States: Annual Statistical Update 2021* (2021) https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download .......................................6, 35

Bureau, *National Firearms Act* (last revised Apr. 7, 2020), https://www.atf.gov/rules-and-regulations/national-firearms-act#:~:text=While%20the%20NFA%20was%20enacted,prohibit%2C%20transactions%20in%20NFA%20firearms ..................30

Bureau, *National Firearms Handbook* (2009)..........................................9

Bureau, Open Letter on the Redesign of "Stabilizing Braces," (Jan. 16, 2015), https://www.atf.gov/resource-center/docs/foia/impact-laws-footnote-13-2015-atf-open-letter/download ....................................................5

Everytown for Gun Safety, *Mass Shootings in the United States* (2023), https://everytownresearch.org/mass-shootings-in-america/ ......................................36

James A. D'Cruz, Note, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493 (2017) ...............................................28

Letter from ATF #2013-0172 (Nov. 26, 2012)....................................3, 4

Letter from ATF #2014-301737 (Mar. 5, 2014) ..................................4, 48

Letter from ATF #2014-302672 (Dec. 15, 2014) ......................................5

Letter from ATF #9000:GM,5000 (Mar. 21, 2017)....................................5

Michael S. Obermeier, Comment, *Scoping Out the Limits of "Arms" Under the Second Amendment*, 60 U. Kan. L. Rev. 681 (2012) ................................................................. 28

Mila Sohoni, *The Lost History of the "Universal" Injunction*, 133 Harv. L. Rev. 920 (2020) ................................................. 59

Oliver Krawczyk, Comment, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273 (2022)............................ 35

Phillip Hamburger, *Is Administrative Law Unlawful?* (2014) ............. 41

Sentencing Hr'g Tr., *United States v. Kamali*, No. 3:18-cr-00288 (D. Conn. Sept. 30, 2019), ECF 110 .................................. 6

Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason U. Civ. Rts. L.J. 67 (1991).................................................. 33

## Treatises

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* (2d ed. 1995) .............................. 21

Benjamin Vaughan Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880) ......................................................... 28

Elias Merwin, *Principles of Equity and Equity Pleading* (H.C. Merwin ed., 1895)................................................... 55

Thomas M. Cooley, *General Principles of Constitutional Law* 271 (1880) ....................................................... 27, 28

## Constitutional Provisions

U.S. Const. amend. II ..................................................... 30, 56

U.S. Const. art. I, § 8, cl. 16 .............................................. 31

U.S. Const. art. III, § 1 ................................................... 59

U.S. Const. art. III, § 2, cl. 1 ............................................ 59

## STATEMENT OF THE ISSUES

Last year, the Bureau of Alcohol, Tobacco, Firearms, and Explosives promulgated a new rule that would subject at least 1.4 million Americans to a burdensome regulatory scheme. *See* 88 Fed. Reg. 6478, 6560 (Jan. 31, 2023). For over a decade, the Bureau maintained that pistols with a stabilizing brace are not "short-barreled rifles;" accordingly, owners were not required to comply with the registration and taxation requirements of the National Firearms Act of 1934. *Mock v. Garland*, 75 F.4th 563, 571–72 (5th Cir. 2023). The Bureau, via the rule, changes course: now, the Bureau purports that all or nearly all pistols with a stabilizing are short-barreled rifles—it claims that its prior interpretations were wrong while confusingly declaring that it is not changing any policy. 88 Fed. Reg at 6478.

This response brief concerns appeals from two district court decisions about the new rule. In *Britto v. Bureau*, the district court stayed the new rule because it is not a "logical outgrowth" of what the Bureau proposed. 2023 WL 7418291, at *3, 5 (N.D. Tex. Nov. 8, 2023). In *Texas Gun Rights, Inc. v. Bureau*, the same court—but a different judge— preliminarily enjoined the Bureau from enforcing the rule, concluding it

is arbitrary and capricious. 2023 WL 8352316, at *4–5 (N.D. Tex. Oct. 4, 2023).

This Court is asked to decide whether the district court abused its discretion by staying or preliminarily enjoining enforcement of the new rule. The four issues presented are:

(1) Whether some likelihood exists that the new rule is invalid.

(2) Whether equitable factors weigh in favor of relief.

(3) Whether the district court in *Britto* appropriately exercised its discretion by issuing a stay under 5 U.S.C. § 705.

(4) Whether the district court in *Texas Gun Rights* appropriately exercised its discretion by issuing a preliminary injunction that protected members of two associations.

## STATEMENT OF THE CASES

For context, some pistols, due to their recoil and weight, are difficult to fire one-handed, especially for people with limited mobility or strength. 86 Fed. Reg. 30,826-01, 30,827 (June 10, 2021). Veterans are among those most affected. *See id.*

Over a decade ago, an inventor recognized this problem, so he created a "stabilizing brace." 88 Fed. Reg. at 6479. The original brace had

a "foam-type rubber" molding in the shape of an "upside down 'U,' " which could be "strap[ped]" to a forearm to provide "additional support." Letter from ATF #2013-0172, at 1 (Nov. 26, 2012).

In 2012, the Bureau was asked whether configuring a pistol with the original stabilizing brace would make the firearm a "short-barreled rifle." 88 Fed. Reg. at 6482–83. A picture of the brace was submitted to the Bureau:





*Id.* at 6482. In a letter, the Bureau responded that "such a firearm *would not be* subject to . . . [the National Firearm Act's] controls." ATF #2013-0172, at 1. The Act defines a short-barreled rifle as a "rifle" with "a barrel . . . of less than 16 inches in length." 26 U.S.C. § 5845(a). The Act

further defines a "rifle" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder . . . ." § 5845(c). Consistent with the picture, the Bureau reasoned that the brace was meant to be strapped to a shooter's forearm to facilitate one-handed fire, not pressed against a shooter's shoulder. ATF #2013-0172, at 1.

The Bureau similarly classified variations on the original stabilizing brace. *Mock*, 75 F.4th at 571–72. As this Court recognized in *Mock v. Garland*, the Bureau's decisions lacked a "unifying logic;" however, with few "exceptions," the Bureau "maintained that . . . braces were not stocks and that pistols equipped with braces were not short-barreled rifles." *Id.* at 572.

For example, in an early 2014 letter, the Bureau concluded that a pistol, when configured with a variation, was not a short-barreled rifle, regardless of whether a specific shooter actually used a stabilizing brace to facilitate shoulder fire. Letter from ATF #2014-301737 (Mar. 5, 2014). The Bureau said it does not "classify weapons based on how an individual uses a weapon." *Id.*

Later in 2014, the Bureau made a similar decision, although it backtracked a bit on its previous reasoning, noting in a letter that a pistol

with a stabilizing brace is not a short-barreled rifle so long as it is "used as originally designed and NOT used as a shoulder stock." Letter from ATF #2014-302672 (Dec. 15, 2014).

In 2015, the Bureau issued an "open letter" in which it stated: "attaching the [stabilizing] brace to a firearm does not alter the classification of the firearm or subject the firearm to National Firearms Act . . . control." Bureau, Open Letter on the Redesign of "Stabilizing Braces," at 1 (Jan. 16, 2015), https://www.atf.gov/resource-center/docs/foia/impact-laws-footnote-13-2015-atf-open-letter/download.

In 2017, the Bureau, once again, wrote in a letter that "[w]ith respect to stabilizing braces, . . . [the Bureau] has concluded that attaching the brace to a handgun as a forearm brace does not 'make' a short-barreled rifle because . . . it is not intended to be and cannot comfortably be fired from the shoulder." Letter from ATF #9000:GM,5000 (Mar. 21, 2017). The Bureau also said that "incidental, sporadic, or situational use" of a brace for shoulder firing did not constitute a "redesign." *Id.*

In 2019, during a criminal prosecution, the Bureau emphasized that its past decisions "correctly state that . . . [it] consider[s] a firearm

with a pistol [stabilizing] brace to not be a rifle . . . ." Sentencing Hr'g Tr. at 38, *United States v. Kamali*, No. 3:18-cr-00288 (D. Conn. Sept. 30, 2019), ECF 110. Each of these letters and the criminal prosecution were discussed by this Court in *Mock*. 75 F.4th at 571–72.

Given the Bureau's position from 2012 to quite recently, stabilizing braces gained popularity: The Bureau conservatively estimates that at least 1.4 million Americans own between 3 and 7 million pistols with a brace. 88 Fed. Reg. at 6560–61.

Americans relied on the Bureau's position to ensure that they were not inadvertently committing crimes. Under the National Firearms Act, a short-barreled rifle owner must register his or her firearm with the Bureau and retain "proof of registration." 26 U.S.C. § 5841(e). Owners are tracked in a "central registry" along with their "address." § 5841(a)(3). For reference, in 2021, over 530,000 short-barreled rifles were registered. Bureau, *Firearms Commence in the United States: Annual Statistical Update 2021*, at 16 (2021) https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download. Owners must pay a transfer tax of $200. 26 U.S.C. § 5811(a). Violating these requirements is a felony: the penalty is

imprisonment of not more than 10 years, a fine of not more than $10,000, or both. 26 U.S.C. § 5871.

In June 2021, the Bureau published a Notice of Proposed Rulemaking, in which the Bureau proposed reversing its position. 88 Fed. Reg. at 6494. The proposed rule would have implemented a worksheet to classify firearms. *Id.* In this Court's words, "[the] [w]orksheet assigned points to various design criteria to indicate whether a brace device, in conjunction with the firearm, was intended to be shouldered when fired." *Mock*, 75 F.4th at 573. If the point value were high enough, the firearm would be classified as a short-barreled rifle. *Id.* The Bureau received over 237,000 comments, of which over 217,000 were opposed to at least "aspects" of the proposed rule. 88 Fed. Reg. at 6497.

Toward the beginning of 2023, the Bureau published the new rule, in which the Bureau "abandoned" the worksheet. *Mock*, 75 F.4th at 574. Instead of a point system, the rule states that a "rifle" includes any firearm that "is equipped with an accessory, component, or other rearward attachment (e.g., a 'stabilizing brace') that provides surface area that allows the weapon to be fired from the shoulder, provided other factors . . . indicate that the weapon is designed, made, and intended to

be fired from the shoulder." 88 Fed. Reg. at 6574. These other factors are: (1) "Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;" (2) "Whether the weapon has a length of pull . . . that is consistent with similarly designed rifles;" (3) "Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;" (4) "Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;" (5) "The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon;" and (6) "Information demonstrating the likely use of the weapon in the general community." *Id.* at 6574–75. The rule does not specify how these factors are to be weighed.

The Bureau explained its reasoning in a 98-page preamble. *Id.* at 6478. Confusingly, the Bureau took the position that "th[e] rule does not impose any new legal obligations . . . ." *Id.* It repeated this point; however, it also claimed to "acknowledge[] that th[e] rule is a change in position . . . ." *Id.* at 6501–02, 6506. The Bureau minimized the reliance

interest it created by quoting a guidance document in which the Bureau said that its "classifications are subject to change . . . ." *Id.* at 6507 (quoting Bureau, *National Firearms Handbook* § 7.2.4.1 (2009)).

The Bureau purported that the new rule was necessary for a few reasons. First, the Bureau said its prior interpretations had caused confusion and were wrong because the Bureau had purportedly "placed improper weight on whether the 'stabilizing brace' at issue could be used as a 'brace' to support single-handed fire rather than whether the overall configuration of the firearm with the attached 'brace' is designed and intended to be fired from the shoulder . . . ." *Id.* at 6501–02.

Second, the Bureau claimed that it had "beg[u]n to see" that stabilizing braces could be used to facilitate shoulder fire. *Id.* at 6479, 6505. For example, the Bureau stated that a "manufacturer's video clearly shows it informed the public about and marketed its 'brace' devices for uses that go far beyond the original design and intent of the 'brace' . . . ." *Id.* at 6505. The Bureau used several screenshots to support this claim (one of which is provided below for reference); however, as the Bureau acknowledged, the screenshots "d[o] not include footage of a

firearm with its 'stabilizing brace' being fired from the shoulder . . . ." *Id.* at 6504–05.



*Id.* at 6504. Notably, the Bureau also purported that it found "one . . . manufacturer advertised . . . a . . . 'brace[]' as a shoulder stock . . . ." *Id.* at 6505 & n.91. Below is a screenshot of the advertisement cited for this proposition:



No Tax Stamp Required! Innovation & Added Functionality!
The SB47 stabilizing brace is an awesome invention that secures AK style pistols to the forearm of the shooter and assists in firing the pistol the way it is intended - with one hand. Using the SB47 in this way, recoil is reduced significantly, resulting in more accurate shooting without compromising safety, comfort or control. Designed and made by a U.S. Military veteran with help from a top V.A. prosthetic specialist, the intent and design of the stabilizing brace is to help America's wounded veterans enjoy large frame handgun shooting again. The concept was to invent and create a device that would act as an extension of one's own arm - so it is like a part of your body. Well the SB47 did that - and more! Not only did it help our wounded heroes regain their confidence and handgun skills, it was wicked fun for anyone to use! BATF approved for everybody, the SB47 does not require any special permits, doctors notes or SBR tax stamp! Will fit PAP M92 PV, PAP M85 PV, Draco and C39 Pistols. Condition: New.
Click here for instructions!

| **Email Friend** | **Price:** $139.95 | [1] Add to cart |
|---|---|---|

The advertisement visually depicts a brace strapped onto a forearm.

Third, the Bureau said that the new rule was necessary because some social media influencers had stated in their content that the Bureau did not consider "improper[]" use of a pistol with a stabilizing brace "a

design change." *Id.* at 6506. In the Bureau's view, these influencers, by publicly stating the Bureau's prior interpretations, evidenced that "manufacturers and owners" were "circumvent[ing] the [National Firearms Act] . . . ." *Id.* Notably, this discussion appeared in the context of responding to concerns that the Bureau was changing its policy. *Id.* at 6501.

Fourth, the Bureau relied on crime data to support the new rule. *Id.* at 6508. The Bureau noted that it was aware of "two mass shooting incidents" involving pistols with a stabilizing brace—it did not define the phrase "mass shooting." *Id.* The Bureau also claimed that between 2015 and 2022, it had 105 "firearms cases or investigations" involving braces. *Id.* at 6499. The Bureau, however, did not explain the outcome of any of these cases or investigations or whether they involved a shooter firing a pistol with a brace from the shoulder. *Id.* The Bureau also did not consider whether the data it had, relative to the total number of Americans who own a pistol with a brace, established a statistically significant correlation between gun violence and braces. *Id.* Instead, it simply stated that the data it relied on confirmed its hypothesis that "[t]he compact size of these firearms" makes them of interest to criminals.

*See id.* The Bureau also did not explain how the data informed its understanding of the statutory text at issue—notably, the Bureau deemed "irrelevant" other considerations that have at least as much bearing on the purpose of braces, such as the increased accuracy and enjoyability of firing pistols with a brace. *Id.* at 6557.

The Bureau responded to concerns about the Second Amendment to the United States Constitution by declaring that pistols with a stabilizing brace are "dangerous and unusual." *Id.* at 6548. It did not seriously try to satisfy the historical analogue test, other than to briefly note that firearms regulated by the National Firearms Act "were not historically protected by the Second Amendment . . . ." *Id.* The Bureau also claimed that registration and taxation requirements are outside the purview of the Second Amendment, seemingly taking the position that only a literal "ban[]" would potentially create a constitutional issue. *Id.*

The Bureau has estimated that, under the new rule, about 99 percent of pistols with a stabilizing brace are short-barreled rifles. *Mock*, 75 F.4th at 574. In this Court's words, "[w]e . . . cannot find a single given example of a pistol with a stabilizing brace that would constitute [a National Firearms Act]-exempt braced pistol." *Id.* at 575.

Notably, the Bureau went to great lengths in the new rule's preamble to explain that it is regulating firearms with a stabilizing brace—not braces alone—but the Bureau also purported to give brace owners various options that are in tension with that characterization. *E.g.*, 88 Fed. Reg. at 6557 ("[T]his rule does not regulate or prevent the use of 'stabilizing brace' devices themselves . . . ."). For example, these options include permanently removing and disposing of the brace so that it cannot be re-installed. *Id.* at 6570.

*Britto* was brought by three veterans. ROA.23-11203.13–14. Each swore that he owns a pistol with a stabilizing brace, which he uses for recreation and self-defense. *Id.* at 108–13. One explained that "[b]ecause of combat-related disability affecting my right shoulder, I have no interest in firing this firearm from my shoulder or otherwise using the stabilizing brace as a shoulder stock." *Id.* at 109. Another explained that, after serving honorably, he was shot 15 times, making a brace "a practical necessity." *Id.* at 110–11. He too explained that he does not shoulder fire his pistol. *Id.* at 111. The third similarly said that he did not understand his pistol as designed to be placed against the shoulder. *Id.* at 112. Two

of them explained that the brace "makes the firearm more accurate and therefore safer." *Id.* at 110, 112.

The three veterans filed a motion to stay the new rule, arguing that the rule: (1) violates the Second Amendment; (2) violates the Fifth Amendment; (3) violates the separation of powers; (4) conflicts with the definition of "rifle" in the National Firearms Act; (5) is arbitrary and capacious. *Id.* at 73, 76.

The three veterans and the Bureau jointly moved to hold the motion pending a decision from this Court in *Mock*, and the district court agreed. *Id.* at 1242, 1247. As the parties explained, "[t]he . . . decision in *Mock* . . . will likely provide significant guidance for resolving this case on the merits" because *Mock* involved "relevant legal issues." *Id.* at 1242.

A few months later, in *Mock*, this Court held that the new rule was not a logical outgrowth of the proposed rule because the proposed rule never gave "notice that . . . [the Bureau] was considering getting rid of the [w]orksheet for a vaguer test." 75 F.4th at 584. In this Court's words, the new rule "[r]emov[ed] all objective criteria. . . . [C]ommentators reading the proposed rule's language could not have reasonably foreseen that the [f]inal [r]ule would replace the worksheet entirely with a more

subjective six-factor test." *Id.* On remand, the district court in *Mock* permanently enjoined the Bureau from enforcing the rule. 2023 WL 6457920, at *18 (N.D. Tex. Oct. 2, 2023).

The three veterans and the Bureau then submitted a joint status report. ROA.23-11203.1276. The parties agreed that this Court's decision in *Mock* was not controlling because the veterans had not raised a logical-outgrowth argument (although the veterans did not "disavow[]" the decision, as the Bureau claims that they did). *Id.* at 1277; Bureau's Br., at 18. The veterans also submitted the district court's decision in *Mock* as supplement authority, with the consent of the Bureau. ROA.23-11203.1280, 1332.

The district court applied this Court's decision in *Mock* and granted the motion. *Britto*, 2023 WL 7418291, at *3, 5. The district court noted that both parties agreed that *Mock* "provides substantial guidance." *Id.* at *3. The court sought to avoid reaching constitutional and statutory questions. *Id.*

In *Texas Gun Rights*, two associations, including one with members throughout the United States, similarly argued that the new rule is invalid on several constitutional and statutory grounds. ROA.23-

11204.10–12. An official from each association submitted a sworn declaration. The director of one explained that the association "has members who can no longer lawfully possess a pistol with a stabilizing brace" without complying with the new rule. *Id.* at 276. The director also noted that one member "disassembled" his or her "pistol . . . thereby rendering it" inoperative rather than registering it. *Id.* The director explained that other members were in "the same position" and that one wanted to purchase such a pistol. *Id.* at 276–77. The other official's declaration gave a similar account. *Id.* at 278–79.

*Texas Gun Rights* proceeded similarly to *Britto*, and post-*Mock*, the district court concluded that the new rule is arbitrary and capricious. *Tex. Gun Rights*, 2023 WL 8352316, at *4–5. It emphasized that the Bureau had not sufficiently acknowledged the reliance interest it created with its prior interpretations. *Id.* at *3. It also referenced this Court's decision in *Mock*, noting that "the . . . [Bureau's] decision to skirt notice-and-comment provisions is arbitrary and capricious *per se* . . . ." *Id.* at *4. The court preliminarily enjoined enforcement of the rule against the two associations and their members, exempting members who may be prohibited from owning a firearm altogether. *Id.* at *4–5.

The Bureau appealed from these decisions and a few others and filed a motion to consolidate, which this Court granted.

## SUMMARY OF THE ARGUMENT

This Court should affirm these decisions on whatever grounds this Court concludes are appropriate. *Cardoso v. Reno*, 216 F.3d 512, 515 (5th Cir. 2000) (quoting *Bickford v. Int'l Speedway Corp.*, 654 F.2d 1028, 1031 (5th Cir. 1981)) ("[R]eversal is inappropriate if the ruling of the district court can be affirmed on any grounds, regardless of whether those grounds were used by the district court."). Most critically, the new rule violates the Second Amendment, which provides that "the right of the people to keep and bear Arms[] shall not be infringed." A firearms regulation cannot withstand judicial scrutiny unless the government can point to a "historical analogue" demonstrating that the regulation is consistent with the original understanding of the Second Amendment. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 30 (2022) (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d Cir. 2021)). The Bureau has not identified any such analogue. The rule also violates the Second Amendment because pistols with a stabilizing brace are in common use. Furthermore, the rule violates due process because it is vague. Finally, if

the rule is authorized by statute, then the statute itself is an unconstitutional delegation of legislative power. The rule is also invalid as a matter of statutory law, as recognized in multiple decisions. *E.g.*, *Mock*, 75 F.4th at 586. Indeed, in *Mock*, this Court held that the Bureau violated the Administrative Procedures Act because the rule is not a "logical outgrowth" of what the Bureau proposed. *Id.* Additionally, the rule conflicts with the statutory definition it purports to interpret and is arbitrary and capricious.

## STANDARD OF REVIEW

District courts have wide latitude in crafting equitable remedies; accordingly, this Court should not disturb the stay or preliminary injunction unless the district court abused its discretion. *See Whirlpool Corp. v. Shenzhen Sanlida Elec. Tech. Co.*, 80 F.4th 536, 543 (5th Cir. 2023). This Court should focus on whether the district court reached outcomes supported by the record, not whether it agrees with the district court's reasoning. *Cardoso*, 216 F.3d at 515; *see also Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (quoting *Holtzclaw v. DSC Commc'ns Corp.*, 255 F.3d 254, 258 (5th Cir. 2001)) ("An appellate court may affirm summary judgment 'on any

ground supported by the record, even if it is different from that relied on by the district court.' "). This Court also should defer to any findings made by the district court unless they are clearly erroneous. *Whirlpool*, 80 F.4th at 543.

A district court may issue a stay or a preliminary injunction if the moving party demonstrates: (1) "a substantial case on the merits;" (2) "a substantial threat of irreparable harm;" (3) "that the threat of injury outweighs any harm that . . . [relief] would cause;" and (4) "that the public interest is not disserved by . . . [relief]." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 241–42 (5th Cir. 2023) (quoting *Garcia v. Jones*, 910 F.3d 188, 190 (5th Cir. 2018); *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009)), *cert. granted on other grounds sub. nom.*, *Danco Lab'ys, LLC v. All. for Hippocratic Med.*, 144 S. Ct. 537. A threshold showing on each factor is necessary but if each such showing is made, the district court is empowered to weigh the pros and cons of relief, and a greater showing on one factor may negate the need for a greater showing on another. *Mock*, 75 F.4th at 587.

In these appeals, much turns on the first factor. The first and second factors are largely overlapping because "[t]he loss" of a

constitutional right, "for even minimal periods of time," is "irreparable" harm. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Even an "alleged deprivation" is normally enough. *Id.* (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995)). Alleged violations of the Administrative Procedures Act are treated similarly. *Louisiana v. Horseracing Integrity & Safety Auth. Inc.*, 617 F. Supp. 3d 478, 500 (W.D. La. 2022). Additionally, an administrative agency can never claim a cognizable interest in enforcing an unlawful rule, so the first two factors effectively merge with the third. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Lastly, when an agency is the opposing party, the third and fourth factors are "merge[d]." *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 436 (2009)).

## ARGUMENT

This Court should affirm both decisions, especially considering the deferential standard of review. The district court did not abuse its discretion in either *Britto* or *Texas Gun Rights*.

# I.   The three veterans and the two associations are likely to succeed on the merits.

As a preliminary matter, on the first factor, the threshold showing is low: a moving party need only present "some likelihood of success on the merits"—a plaintiff need not win his or her case at the outset. *All. for Hippocratic Med.*, 78 F.4th at 242 (quoting *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Parish*, 849 F.3d 615, 626 (5th Cir. 2017)).

The three veterans and the two associations can more than satisfy this threshold showing. The new rule is invalid for various reasons.

## A.   The new rule is unconstitutional.

The three veterans and the two associations each raised multiple constitutional arguments, which are likely to succeed. The new rule violates the Second Amendment and is unconstitutionally vague. If the Bureau has actually been authorized to promulgate such a rule, the authorizing statute is also an unconstitutional delegation of legislative power to the executive.

**i.    The new rule violates the Second Amendment because it reaches conduct covered by the Amendment's plain text and lacks a historical analogue.**

The three veterans and the two associations raised the Second Amendment. Recently, the United States Supreme Court clarified the doctrinal framework for addressing Second Amendment arguments. *Bruen*, 597 U.S. at 17. This Court is required to proceed in two steps. *Id.*

First, this Court should determine if "the Second Amendment's plain text covers . . . [the] conduct" at issue—if it does, the conduct is "presumptively protect[ed]." *Id.* Notably, the United States Supreme Court favors a broad reading of "arms": "arms" covers "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (quoting 1 *A New and Complete Law Dictionary* (1771)).

Second, if the conduct is within the plain text, the government—in these appeals, the Bureau—bears the burden. *Bruen*, 597 U.S. at 24. The Bureau must "affirmatively prove" that the new rule "is part of the historical tradition that delimits the outer bounds of the right . . . ." *Id.* at 19.

Accordingly, at step 2, the Bureau must point to a "historical analogue." *Id.* at 30 (quoting *Drummond*, 9 F.4th at 226). Although the analogue need not be a literal "*twin*," it must be "well-established and representative," so as to not "risk[] endorsing outliers that our ancestors would never have accepted." *Id.* (quoting *Drummond*, 9 F.4th at 226). The analogue generally must have addressed a similar problem in a similar way (i.e., the "*how*" and "*why*" of the analogue must be on point). *See United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023), *cert. granted*, 143 S. Ct. 2688. The Bureau may rely on an analogue existing "before, during, and even after the founding;" however, post-ratification analogues are relevant only to the extent that they are indicative of original understanding. *Bruen*, 597 U.S. at 27, 35–36; *see also Rahimi*, 61 F.4th at 462 (Ho, J., concurring).

Turning to step 1, a pistol with a stabilizing brace is a "thing that a man . . . [can] useth in wrath to cast at or strike another"—accordingly, it is an "arm" covered by the Second Amendment's plain text. *Heller*, 554 U.S. at 581 (quoting 1 *A New and Complete Law Dictionary*). Each component of such a pistol is, by definition, also a thing that can be used for self-defense. *See Barnett v. Raoul*, 2024 WL 756161, at *3 (S.D. Ill.

Feb. 23, 2024). The brace is a component of a pistol, just like a barrel, magazine, sight, or trigger—like these other constituent parts, the brace serves a self-defense purpose. Indeed, it has no practical, standalone function.

Employing similar reasoning, a district court in this circuit concluded that "silencers" are covered by the Second Amendment's plain text (although, it ultimately ruled against a defendant at step 2). *United States v. Comeaux*, 2024 WL 115929, at \*2 n.1 (W.D. La. Jan. 10, 2024). As it explained, "once incorporated into a firearm, the firearm silencer significantly alters an important and defining characteristic of that firearm by greatly lessening the noise emitted when discharged." *Id.* Components of a firearm, in the court's words, must be protected even if they do not literally "expel a bullet." *Id.*

A stabilizing brace, even more so than a silencer, is a component of an arm. It "significantly alters" an "important and defining characteristic" of a pistol (indeed, the Bureau claims it makes a pistol a short-barreled rifle). *See id.* In fact, while a firearm could presumably facilitate self-defense just as well without a silencer, a brace materially affects the direction of the bullet. *See id.* As described by one member of

this Court, a brace "improve[s] a pistol's stability," thereby increasing "accuracy," which "promotes safety." *See Mock*, 75 F.4th at 588 (Willett, J., concurring). Accordingly, for many people, such as the three veterans, a brace is as necessary for effective firearm handling as the components that literally expels the bullet forward. Indeed, each veteran swore that he used a pistol with a brace for self-defense, and a firearm cannot serve a self-defense purpose if its shooter cannot aim it accurately. ROA.23-11203.108–13.

The Bureau has seemingly argued that the Second Amendment's plain text does not cover any components of a firearm unless they are involved in literally expelling a bullet. *See id.* at 788. It mischaracterizes stabilizing braces as mere "accessories." *Id.* In its view, a brace, standing alone, is not an "arm." *Id.*

The Bureau has erred; as it acknowledged, many shooters "wish to use a brace to 'improve the usage of a firearm.'" *Id.* Accordingly, the Bureau admits that a brace is a "thing" that can be "useth in wrath to cast at or strike another"—the definition of an "arm." *Heller*, 554 U.S. at 581 (quoting 1 *A New and Complete Law Dictionary*).

The Bureau's accessory defense also suffers from another flaw: the Bureau went to great lengths in the preamble to explain that it is not regulating stabilizing braces but rather firearms with a brace. *E.g.*, 88 Fed. Reg. at 6557. The Bureau had to take this position because the Bureau lacks rulemaking authority to directly regulate braces—the statute on which it relied gives it the authority to regulate short-barreled rifles, not accessories. *See* 26 U.S.C. § 5845(a). The Bureau did not mention this accessory defense in the preamble when responding to commenters who raised the Second Amendment. 88 Fed. Reg. at 6548.

Even if a stabilizing brace were an accessory, such a label is not dispositive. At a minimum, the Second Amendment's plain text covers things that aid in bearing a firearm proficiently. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011). As one treatise from 1880 explained, "to bear arms implies something more than the mere keeping; it implies the learning to handle and use [of] them in a way that makes those who keep them ready for their efficient use . . . ." Thomas M. Cooley, *General Principles of Constitutional Law* 271 (1880). A different treatise from that same year said, "a citizen who keeps a gun or pistol under judicious precautions, [and] practi[c]es in safe places the use of

it, . . . exercises his individual right." Benjamin Vaughan Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880). Notably, the United States Supreme Court has relied upon both treatises to expound on the Second Amendment's plain text. *Heller*, 554 U.S. at 617–619 (quoting Cooley, *General Principles of Constitutional Law*, at 271; Abbott, *Judge and Jury*, at 333).

Accordingly, at a minimum, an accessory that aids a significant portion of the population in properly handling a pistol is protected. A stabilizing brace is such a thing.

Turning to step 2, a historical analogue for the new rule does not exist. Notably, short-barreled rifles were in common use at the founding. *See, e.g.*, James A. D'Cruz, Note, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 503–04 (2017); Michael S. Obermeier, Comment, *Scoping Out the Limits of "Arms" Under the Second Amendment*, 60 U. Kan. L. Rev. 681, 706 (2012). No evidence has been presented that they were specifically targeted for government regulation until the National Firearms Act— about 150 years after the founding. Indeed, the Bureau, for over a decade, maintained that pistols with a stabilizing brace are not even short-

barreled rifles. *See Mock*, 75 F.4th at 571–72 (majority opinion). So much for a "well-established and representative" analogue. *Bruen*, 597 U.S. at 30.

The Bureau has not seriously tried to satisfy the historical analogue test. Before the district court (not in the preamble), it vaguely referenced various early statutes, which can be roughly grouped into four categories. ROA.23-11203.795–97. It did not explain whether these statutes were enforced. *See Bruen*, 597 U.S. at 58. The Bureau also largely left unsaid what it wanted the district court to take away from these statutes. These statutes did not create a central registry or condition the right to keep and bear arms on giving up anonymity. *Cf. Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–66 (2002) ("It is offensive . . . that in the context of everyday public discourse a citizen must first inform the government of [his or] her desire to speak . . . ."). They also do not establish that a poor American can be inhibited from exercising a constitutional right by an exorbitant tax. *Compare Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936) ("[The tax] is bad because . . . it is seen to be a deliberate and calculated device . . . to limit . . . constitutional guaranties."), *with* Bureau, *National Firearms*

*Act* (last revised Apr. 7, 2020) ("While the . . . [National Firearms Act] was enacted by Congress as an exercise of its authority to tax, the . . . [Act] had an underlying purpose unrelated to revenue collection. . . . [I]ts underlying purpose was to curtail, if not prohibit, transactions in . . . [certain] firearms."), https://www.atf.gov/rules-and-regulations/national-firearms-act#:~:text=While%20the%20NFA%20was%20enacted,prohibit%2C%20transactions%20in%20NFA%20firearms.

First, the Bureau referenced a few early statutes that required militia commanders to, for example, "exercise the men" under their "command" by "muster[ing]" them and by taking account of "arms and munition . . . ." 1631 Va. Acts 174, Acts of Feb. 24, 1631, Act LVI, https://firearmslaw.duke.edu/laws/1631-va-acts-174-acts-of-february-24th-1631-act-lvi.

Such statutes are not historical analogues—the Bureau is not trying to ensure that the United States has a "[a] well regulated Militia." U.S. Const. amend. II. The Bureau does not employ militia commanders, and the million-plus Americans who must comply with the new rule are not "men" in a Bureau-based chain-of-command. Indeed, the National

Firearms Act was not passed pursuant to Congress's power "[t]o provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States . . . ." U.S. Const. art. I, § 8, cl. 16. The Act was passed pursuant to Congress's taxing power—the Act is a part of the Internal Revenue Code, not the Uniform Code of Military Justice. 88 Fed. Reg. at 6482 n.15.

Second, the Bureau referenced early statutes that required barrels to be "proved" to ensure that they would not blow up and injure someone when fired. ROA.23-11203.796. The three veterans and the two associations have been unable to locate the specifically cited statutes. For example, one such statute purportedly appears on pages 259 to 261 of the *Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28* (1807), https://www.google.com/books/edition/The_Laws_of_the_Commonwealth_of_Massachu/px8wAAAAYAAJ?hl=en&gbpv=1&pg=PP5&printsec=frontcover. On those pages appear acts dealing with various topics, such as navigable waters—but nothing to do with firearms. *Id.* The veterans and associations were, though, able to locate other statutes that required a "person appointed" to "prove[]" barrels by discharging "powder equal in

weight to the ball which fits the bore." 1814 Mass. Acts 464, ch. 192, § 1, https://firearmslaw.duke.edu/laws/1814-mass-acts-464-an-act-in-addition-to-an-act-entitled-an-act-to-provide-for-the-proof-of-fire-arms-manufactured-within-this-commonwealth-ch-192-c2a7-1.

Such statutes are also not historical analogues—and for similar reasons. The new rule does not require anyone to test-fire a pistol with a stabilizing brace. The Bureau is not trying to ensure that shooters are not blown up. It does not claim to be acting pursuant to general police powers.

Third, the Bureau referenced early statutes that it says regulated the transportation of gunpowder, but the Bureau did not explain how these statutes are historical analogues. ROA.23-11203.796. The Bureau is not trying to ensure that explosives are not set off in transit.

Lastly, the Bureau referenced early statutes that it says taxed firearms. For example, it referenced an 1866 Georgia statute that imposed a $1 tax on each firearm "over the number of three kept or owned on any plantation . . . ." 1866 Ga. Laws 27–28, https://firearmslaw.duke.edu/laws/1866-ga-laws-27-28-an-act-to-authorize-the-justices-of-the-inferior-courts-of-camden-glynn-and-

effingham-counties-to-levy-a-special-tax-for-county-purposes-and-to-regulate-the-same-c2a7c2a7-3.

Again, such statutes are not historical analogues. In 1866, $1 was about equal to about $20 today. The National Firearms Act imposes a $200 tax—ten times that amount. Additionally, a special tax on plantation owners—presumably among the richest Americans of their day—is not the same as a tax applicable to any American, many whom may not be able to pay. Lastly, the 1866 statute did not kick in unless a plantation owner had at least four firearms on the premises of the plantation. The Bureau ignores nuance. Other such statutes originated in racism, an issue that the Bureau has not explored. Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason U. Civ. Rts. L.J. 67, 74–75 (1991) (noting some states enacted "exorbitant . . . taxes" so that firearms were "out of the reach of blacks").

At bottom, the "*how*" and "*why*" of these early statutes is not on point. *See Rahimi*, 61 F.4th at 454 (majority opinion). The historical analogue test is not a "regulatory straightjacket," but the Bureau would turn it into a "regulatory blank check"—and it is not such a permissive

test, either. *Bruen*, 597 U.S. at 30. Merely pointing out that firearms were regulated in the past is not enough.

> ## ii.  Alternatively, the new rule violates the Second Amendment because pistols with a stabilizing brace are in common use by law-abiding citizens.

Alternatively, the new rule violates the Second Amendment because it fails the common use test; as the United States Supreme Court has explained, the Second Amendment protects an individual right to keep and bear arms " 'in common use' today for self-defense." *See id.* at 32 (quoting *Heller*, 554 U.S. at 627). A firearm is in common use if it is "commonly possess by law-abiding citizens for lawful purposes *today*." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment). A firearm in common use is distinguishable from a firearm that is "dangerous and unusual." *Id.* at 418 (quoting *Heller*, 554 U.S. at 627).

The "relevant inquiry" is the "total number of a particular weapon" possessed in the United States. *Mock*, 2023 WL 6457920, at *9. For example, one district court found that nunchakus were in common use because the record indicated that Americans owned at least 64,890.

*Maloney v. Singas*, 351 F. Supp. 3d 222, 237–38 (E.D.N.Y. 2018); *see also Caetano*, 577 U.S. at 420 (making a similar point about "stun guns").

On remand in *Mock*, the district court applied the common use test and found that pistols with a stabilizing brace "are in common use today." 2023 WL 6457920, at *9. As it explained, the Bureau acknowledges that at least 1.4 million Americans own at least 3 million such pistols. *Id.* at *9, 13.

Indeed, under the common use test, whether the Bureau can regulate short-barreled rifles at all is suspect—even before the new rule, hundreds of thousands of such rifles were registered. Bureau, *Firearms Commence in the United States*, at 16. The rule will multiply this number several fold, rendering the National Firearms Act even more suspect. *See* Oliver Krawczyk, Comment, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273, 295–98 (2022).

The Bureau claims that pistols with a stabilizing brace are dangerous (it does not really explain how they are unusual) because they are purportedly concealable weapons likely used by criminals. ROA.23-

11203.792. Never mind that such pistols are not all that concealable. *See Mock*, 75 F.4th at 588 (Willett, J., concurring).

The Bureau, in the preamble, relied largely on anecdotal evidence and crime data similar to that which the United States Supreme Court has criticized. *See Bruen*, 597 U.S. at 17 n.3 (holding the dissenting justices erroneously "chronicle[d], in painstaking detail, evidence of crimes committed by individuals with firearms" as a way to "justify granting [s]tates greater leeway in restricting firearm ownership use"). For example, the Bureau emphasized two "mass shootings," in which the Bureau claims that a pistol with a stabilizing brace was reportedly fired from the shoulder. 88 Fed. Reg. at 6508. The Bureau did not define the phrase "mass shootings," but by some definitions, in just 2021 alone (the year in which the Bureau issued a Notice of Proposed Rulemaking), this nation experienced 686 mass shootings. Everytown for Gun Safety, *Mass Shootings in the United States* (2023), https://everytownresearch.org/mass-shootings-in-america/. Between 2015 and 2022, the timeframe for which an organization considered data, it found 3,708 mass shootings. *Id.*

In view of the large number of pistols with a stabilizing brace, 2 mass shootings are statistically insignificant. A reasonable person should conclude from the data that the vast majority of owners are law-abiding citizens and that the new rule will have little to no impact on gun violence. As the Ninth Circuit said last year, "[c]ommon sense tells us that *all* portable arms are associated with criminals to some extent;" accordingly, data demonstrating this fact "simply provide[s] no basis for concluding that [a firearm is] not commonly owned for lawful purposes." *Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023), *vacated & reh'g granted*, 93 F.4th 1150 (2024).

At bottom, the new rule violates the Second Amendment. Whether this Court employs the historical analogue test or the common use test, the outcome should be the same.

### iii.   The new rule violates the Fifth Amendment because it is vague.

Additionally, the new rule violates the Fifth Amendment because it is vague. As the United States Supreme Court has explained, "[t]he void for vagueness doctrine addresses at least two . . . due process concerns." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). First, "regulated parties should know what is required of them so they may act

accordingly;" second, "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.* The Court has held that a statute or regulation cannot be enforced if it lacks "sufficient definiteness" such that "ordinary people" cannot "understand what conduct is prohibited." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A statute or regulation need not be "vague in all applications"—a "clearly unreasonable rate[]" suffices. *Johnson v. United States*, 576 U.S. 591, 602–03 (2015). The doctrine is especially important as applied to statutes and regulations that impose a criminal penalty. *See Kolender*, 461 U.S. at 358.

The two-step test codified by the new rule does not provide Americans with a meaningful opportunity to conform their conduct to it. At step 1, the rule employs the phrase "surface area," but this phrase is undefined. The rule offers no insight into how surface area will be calculated. Whether any firearm lacks literal surface area that could be used to fire from the shoulder is suspect.

More troubling, though, is step 2, which is a six-factor subtest. The new rule provides no insight into how these factors will be weighed. The factors themselves are also unclear: for example, the first factor is

"[w]hether the weapon has a weight or length consistent with the weight or length of similarly designed rifles." 88 Fed. Reg. at 6574. The rule does not explain how the Bureau will determine if a rifle is "similar." The Bureau does not even attempt to explain what will constitute "indirect marketing materials," a phrase appearing in the fifth factor, and the last factor is a literal catch-all: "Information demonstrating the likely use of the weapon in the general community." *Id.* at 6575. Recall that the Bureau thinks that videos, which never actually show anyone shoulder-firing a pistol with a stabilizing brace, somehow demonstrate shoulder-firing as an intended use. *Id.* at 6503–05.

The Bureau's estimations illustrate the problem. It says that about 99 percent of pistols with a stabilizing brace are, under the new rule, short-barreled rifles. *Mock*, 75 F.4th at 574 (majority opinion). It has not made clear what pistols might be a part of the 1 percent that are not. *Id.* at 574–75. To ask a few rhetorical questions, would an ordinary person read the rule and understand that virtually all such pistols are subject to it? How would he or she know if his or her pistol were a part of the 1 percent? This Court in *Mock* even seemed to struggle with these questions. *See id.*

At bottom, the two-step test resembles an infamous "I know it when I see it" test sometimes employed to determine whether media constitutes "hard-core pornography." *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). Indeed, before the district court in *Britto*, the Bureau even argued that the new rule is not vague because the preamble contains "dozens of pictures and graphics . . . ." ROA.23-11203.785. The pictures are not the rule, and the Bureau cited no support for the proposition that an ordinary person is expected to read a lengthy preamble to understand a rule. Additionally, the Bureau argued that the three veterans could ask the Bureau to issue specific opinions; however, this reasoning merely underscores that the rule itself is vague—not to mention, the Bureau apparently reserves the right to change its opinion whenever it wants. *See* ROA.23-11203.786.

> ### iv. If the Bureau has been statutorily authorized to promulgate the new rule, the statute is an unconstitutional delegation of legislative power to the executive.

If the new rule is statutorily authorized, the statute is unconstitutional because it violates the non-delegation doctrine—which is related to the void for vagueness doctrine. *See Kolender*, 461 U.S. at 358. Article I, Section 1 of the United States Constitution vests "[a]ll"

federal "legislative power . . . in a Congress." The people understood themselves to be creating agents, and as one prominent law professor has explained, under the common law of agency, "the agent ordinarily cannot subdelegate the power to a sub-agent, as this runs counter to the apparent intent of the principal. In individual circumstances, this is a matter of personal freedom; in politics, it is a foundation of constitutional liberty." Phillip Hamburger, *Is Administrative Law Unlawful?* 380 (2014). Accordingly, the United States Supreme Court long ago instructed that "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

Under the current formulation of the non-delegation doctrine, in this Court's words, "Congress may grant regulatory power to another entity only if it provides an 'intelligible principle' by which the recipient of the power can exercise it." *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)), *cert. granted sub nom.*, *SEC v. Jarkesy*, 143 S. Ct. 2688 (2023). If Congress provides an intelligible principle, the administrative agency is exercising "executive power, not legislative power," when promulgating an

administrative rule because the rule is a mere codification of the executive's interpretation of the statute. *See id.* at 461 & n.14 (quoting Adrian Vermeule, *No*, 93 Tex. L. Rev. 1547, 1558 (2015)).

An intelligible principle is a textually grounded "policy," "rule," or "standard" that limits "how" an administrative agency "make[s] . . . calls" when promulgating an administrative rule. *Id.* at 462 (quoting *Panama Refining Co. v. Ryan*, 293 U.S. 388, 430 (1935)). When a statute lacks such a principle, its "open-ended" nature makes any promulgation pursuant to it a legislative act. *Id.*

If the Bureau's reasoning is correct, 26 U.S.C. § 5845(c) lacks an intelligible principle. Section 5845(c) defines a "rifle" as a firearm "designed or redesigned, made or remade, and intended to be fired from the shoulder." The Bureau, effectively, claims this language is "open-ended," as if the statute reads, "the Bureau shall define 'rifle.'" The language is so open-ended, in fact, that the Bureau says it can take one position for over a decade and then just abandon that position altogether. Effectively, the Bureau says that it can re-define "rifle" as it pleases. Notably, the statute never mentions "surface area" or anything like the six-factor subtest—the Bureau made up the two-step test. The Bureau

misreads the statute, but if it does not, the statute violates the non-delegation doctrine.

## B. The new rule is invalid on numerous statutory grounds.

This Court could avoid these constitutional issues by deciding these appeals on statutory grounds, although it has discretion to decide these appeals on any or all grounds it considers appropriate. *See Jarkesy*, 34 F.4th at 459 n.9. As Justice Hugo Black said, "there is a judicial practice . . . under which courts do not ordinarily decide constitutional questions unless essential to a decision of the case;" however, "even the greatest of our judges, [including Chief Justice John Marshall,] have not always followed it as a rigid rule." *Clay v. Sun Ins. Off. Ltd.*, 363 U.S. 207, 223 (1960) (Black, J., dissenting).

### i. The Bureau did not comply with the notice requirement of the Administrative Procedures Act in promulgating the new rule.

First, as this Court held in *Mock*, the Bureau did not comply with the notice requirements of the Administrative Procedures Act in promulgating the new rule. 75 F.4th at 583–86. The rule is not a "logical-outgrowth" of the proposed rule, so the proposed rule did not provide "fair

notice" to potential commenters. *Id.* at 583 (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021)).

Accordingly, this Court could apply its precedent in *Mock*, as the district court did in *Britto*. The district court sought to avoid constitutional and statutory questions. *Britto*, 2023 WL 7418291, at *3.

The Bureau does not claim that this Court's precedent in *Mock* was wrongly decided—it argues only that the district court in *Britto* abused its discretion because the three veterans did not raise a logical-outgrowth argument. Bureau's Br. at 19.

The Bureau is wrong—the district court acted appropriately by applying the constitutional avoidance doctrine, especially given that the logical-outgrowth argument appears in the record. Notably, the district court stayed proceedings pending a decision from this Court in *Mock*. ROA.23-11203.1247. The parties then submitted a joint status report, and while all agreed that this Court's decision in *Mock* was not controlling, no one said it was irrelevant. *Id.* at 1277. The Bureau tries to say that the three veterans "disavowed" this Court's decision in *Mock*, but that reasoning ignores that the veterans submitted the district court's *Mock* decision as supplemental authority—with the Bureau's

consent. *Id.* at 1280. Accordingly, the district court did not abuse its discretion in choosing to render a minimalist decision. The logical-outgrowth argument appears in the record, so it is an appropriate ground upon which this Court could affirm the decision of the district court. The same goes for *Texas Gun Rights*.

Additionally, the *Britto* appeal has been consolidated with the *Texas Gun Rights* appeal, and the district court in *Texas Gun Rights* (citing this Court's decision in *Mock*) concluded that "the . . . [Bureau's] decision to skirt notice-and-comment provisions is arbitrary and capricious *per se* . . . ." 2023 WL 8352316, at *4. The three veterans raised an arbitrary and capricious argument, which is closely related and should be addressed by this Court—even under the Bureau's overly strict perversion of the party-presentation principle.

Given *Britto*'s procedural history, the Bureau errs in relying on *United States v. Sineneng-Smith*, 140 S. Ct. 1575 (2020). The United States Supreme Court held only that a "drastic[]" departure from the party-presentation principle constitutes an "abuse of discretion." *Id.* at 1578. In error, the Ninth Circuit had "invited" three specific amici to brief an issue never raised by the parties and which was framed in a manner

"contrary" to the arguments of the party whom the Ninth Circuit ended up siding with. *Id.* at 1578, 1581. While the Court said that courts "normally decide only questions presented by the parties," in the next sentence, it emphasized that this "principle is supple, not ironclad." *Id.* In the Court's words, a "federal court" can "on its own initiative . . . correct a party's 'evident miscalculation.' " *Id.* The Bureau's attempt to rigidly enforce the principle is inconsistent with the reasoning in *Smith* and would effectively require this Court to hold that the district court abused its discretion by trying to rule narrowly.

### ii. The new rule conflicts with the statutory definition of "rifle."

Additionally, the new rule is invalid because it conflicts with the statutory definition of "rifle" in 26 U.S.C. § 5845(c). As this Court has explained, "[a]n administrative agency's authority is necessarily derived from the statute it administers and may not be exercised in a manner that is inconsistent with the administrative structure that Congress has enacted." *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 489 (5th Cir. 2014).

This Court should employ a two-step approach to interpret 26 U.S.C. § 5845(c). The "first step," as the United States Supreme Court

has said, "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute . . . ." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). If this Court so concludes, its interpretative process should "cease." *Id.* If this Court concludes otherwise, various canons come into play, such as the constitutional-doubt canon, the major questions canon, and the rule of lenity. *See Yates v. United States*, 574 U.S. 528, 547–48 (2015) (plurality opinion).

Turning to the first step, 26 U.S.C. § 5845(c) defines a "rifle" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder . . . ." Accordingly, a rifle must be (1) designed or redesigned to be fired from the shoulder; (2) made or remade to be fired from the shoulder; and (3) intended to be fired from the shoulder—all three elements are necessary. Otherwise, some words in the statute are mere surplusage. *See Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017).

The new rule is inconsistent with 26 U.S.C. § 5845(c) because it purports that firearms not meeting each of the three elements are still rifles. Specifically, the rule purports that a firearm that may or could be

fired from the shoulder is a rifle—not so. A pistol with straps that are meant to be latched around a forearm to support one-handed fire is not a rifle. Perhaps some people might use the pistol as if it were a rifle, but as the Bureau said in one letter, "how an individual uses a weapon" is largely irrelevant. ATF #2014-301737. It might show how that individual "intends" to use the firearm (if that individual's intent is even the intent referred to in that statute), but it does not demonstrate the first two elements—design and make. The statute, unambiguously, defeats the rule, which is likely why the Bureau maintained, for over a decade, that pistols with a stabilizing brace are not short-barreled rifles. Even assuming that the most common use for such braces is to shoulder-fire pistols, the pistols remain pistols. For example, the most common use for Fentanyl may be recreational drug use, but no one would say that a lawful manufacturer of Fentanyl is trying to help people get high.

If the statute is ambiguous, at least three canons all point in the same direction. First, the constitutional-doubt canon instructs that courts should avoid interpreting an ambiguous statute in a manner that raises "serious constitutional questions." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476

U.S. 667, 681 n.12 (1986)). The Bureau's reading of 26 U.S.C. § 5845(c) does the complete opposite.

Second, the "major questions doctrine," which is to some extent an application of the constitutional-doubt canon, counsels that Congress must "speak clearly if it wishes to assign to an [administrative] agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022). Courts do not "assume" that Congress desires for agencies to exercise "unprecedented power" in the "absence of a clear mandate." *Indus. Union Dep't, AFL-CIO v. Am. Petro. Inst.*, 448 U.S. 607, 645 (1980) (plurality opinion). Accordingly, "modest words," "vague terms," or "subtle device[s]" in a statute cannot give an agency the power to make "a radical or fundamental change." *West Virginia*, 597 U.S. at 723. The Bureau, effectively, says that it has the power to make a million-plus Americans criminals, having discovered a new meaning within 26 U.S.C. § 5845(c); however, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Third, under the rule of lenity, an administrative agency cannot interpret an ambiguous statute in a manner that increases criminal

liability. *Cargill v. Garland*, 57 F.4th 447, 451, 469 (5th Cir. 2023) (en banc) (plurality opinion), *cert. granted sub nom.*, *Garland v. Cargill*, 144 S. Ct. 374. Indeed, this Court, sitting en banc, recently held a different rule promulgated by the Bureau unenforceable partly because the rule of lenity resolved any ambiguity about the statutory meaning of "machinegun" differently than the Bureau's rule. *Id.* at 469; *see also VanDerStok v. Garland*, 86 F.4th 179, 196 n.26 (5th Cir. 2023) (holding if a statute were ambiguous, another Bureau rule would be unenforceable under the rule of lenity), *petition for cert. filed.*

*United States v. Thompson/Center Arms Co.*, is illustrative. 504 U.S. 505 (1992) (lead opinion). The Bureau said that the United States Supreme Court in *Thompson* held that "packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm within the 'intended to be fired from the shoulder' language . . . ." ROA.23-11203.777 (quoting *Thompson*, 504 U.S. at 513 n.6). Not so. *Thompson* concerned a "gun manufacturer" which shipped a pistol along with a "shoulder stock and a 21-inch barrel." 504 U.S. at 507. Three justices, in a lead opinion, concluded that, pursuant to the rule of lenity, the statute "may not be construed to require payment of the tax under these facts." *Id.* . They

reasoned that "we are not dealing with an aggregation of parts that can serve no useful purpose except the assembly of a [short-barreled rifle]." . *Id.* at 512–13. Two justices concurred only in the judgment, noting that they agreed that the rule of lenity was in play; however, they asserted that "the ambiguity pertains to the much more fundamental point of whether making a regulated firearm includes the manufacture, without assembly, of component parts where the definition does not so indicate." *Id.* at 519 (Scalia, J., concurring in the judgment). The precedential value of the lead opinion is unclear; however, at a minimum, a majority of justices agreed that the rule of lenity required the National Firearms Act to be construed in favor of a gun manufacturer. If shipping a literal "shoulder stock" with a pistol does not make a short-barreled rifle, a pistol configured with a stabilizing brace—which is meant to be strapped to a forearm—is not a short-barreled rifle.

### iii. The new rule violates the Administrative Procedure Act because it is arbitrary and capricious.

The Bureau also violated the Administrative Procedure Act by arbitrarily and capriciously promulgating the new rule (which probably explains why the new rule is not a logical outgrowth of the proposed rule).

*See* 5 U.S.C. § 706(2)(A). In this Court's words, "[a]rbitrary and capricious review focuses on whether an [administrative] agency articulated a rationale connection between the facts found and the decision made." *ExxonMobil Pipeline Co. v. DOT*, 867 F.3d 564, 571 (5th Cir. 2017). Arbitrary and capricious review is a more exacting review when, like in these actions, an agency has reversed a prior policy. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). At a minimum, an agency must recognize that it has, in fact, changed positions. *Id.* "[U]nexplained" and "inconsistent positions" are seriously problematic. *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 191 (5th Cir. 2023).

The new rule was made via a defective process for numerous reasons. First, at numerous points in the preamble to the new rule, the Bureau explicitly stated that it is not changing policy. As the district court noted in *Texas Gun Rights*, the Bureau "did not provide a detailed justification for their reversal of the[ir] . . . longstanding position." 2023 WL 8352316, at *3. Over a decade ago, the Bureau took a position that sparked an entire cottage industry and millions of people have purchased stabilizing braces. Now, it says that about 99 percent of pistols with a stabilizing brace are subject to the new rule. *Id.* This policy change is

arbitrary and capacious. The Bureau can claim all it wants that the new rule provides clarity, but few found the state of the law as unclear before the rule as they do now.

Other arguments presented in the preamble are also arbitrary and capricious. For example, the Bureau lambasted social media influencers for merely stating that the Bureau had taken the position that a pistol with a stabilizing brace is not a short-barreled rifle. 88 Fed. Reg. at 6506. Simply repeating a Bureau position that the law means *A* cannot be evidence that the law does not mean *A*. Yet the Bureau said otherwise in responding to concerns that it had changed its policy. *Id.* at 6501.

Lastly, the Bureau appears to have predetermined a result and then worked backwards to justify it. For example, the Bureau stated that a "manufacturer's video clearly shows it informed the public about and marketed its 'brace' devices for uses that go far beyond the original design and intent of the 'brace' . . . ." *Id.* at 6505. It then included several screenshots, which it had to acknowledge, "d[o] not include footage of a firearm with its 'stabilizing brace' being fired from the shoulder . . . ." *Id.* at 6504–06. As another example, the Bureau claimed to have found "one . . . manufacturer    advertised . . . a . . . 'brace[]'    as    a    shoulder

stock . . . ." *Id.* at 6505 & n.91. The cited advertisement, though, literally includes a picture that shows a brace being fired from a non-shouldered position:



The Bureau could only believe this source actually supported its argument if it were extremely biased in favor of the result it reached.

## II.    Equity weighs in favor of relief.

Equity weighs in favor of relief, both for the three veterans and the two associations. Indeed, this conclusion largely follows from their high likelihood of success on the merits. *See supra* Standard of Review.

### A.    The three veterans and two associations will suffer irreparable harm.

As the district court concluded on remand in *Mock*, the merits of the constitutional arguments aside, the new rule at least "threatens" if not actually "impair[s]" the right to keep and bear arms, which is irreparable harm. 2023 WL 6457920, at *9. The Bureau actually conceded that a "constitutional violation" inherently causes irreparable harm—it takes

issues not with this "general proposition" but with the merits of the constitutional arguments. ROA.23-11203.801.

Irreparable harm is also evident from the district court's findings in *Britto*, which are not clearly erroneous. As it found, the three veterans own "what are likely to be" short-barreled rifles under the new rule. *Britto*, 2023 WL 7418291, at *4. It also emphasized that two of the three veterans had suffered serious injuries (one in combat), and that each used their respective pistol with a stabilizing brace for self-defense. *Id*. In its view, a brace was necessary for each to properly handle their pistol. *Id*.

The new rule has already taken effect, so the three veterans must comply unless it is stayed, or its enforcement is preliminarily enjoined. *Id*. They have options, but each are "costly": (1) they can "permanently modify" the pistols with a stabilizing brace; (2) "dispose of or alter their . . . brace so that it can never be reattached;" (3) "turn over their weapon" to the Bureau; or (4) "destroy their weapon completely." *Id*.

Not a one of these options can be "easily" undone—such injuries, once they occur, are largely beyond "repair[]"—they are, by definition, "irreparable" harms. *See* Elias Merwin, *Principles of Equity and Equity Pleading* 426–27 (H.C. Merwin ed., 1895). "Permanently modify," etc., is

not a phrase used to suggest a temporary change. Additionally, "turning over" a firearm deprives its owner, at least temporarily, of their ability to "keep and bear arms," and the harm that could cause is not fixed merely by giving the firearm back at a later date. *See* U.S. Const. amend. II.

The Bureau makes a few arguments, none of which are persuasive. First, it claims, for the first time on appeal (despite its strict view of the party-presentation principle), that the three veterans may own firearms that the Bureau had already classified as short-barreled rifles before the new rule was promulgated. Bureau's Br., at 33. Accordingly, the Bureau says the veterans "cannot show" that the rule "itself has caused them any irreparable harm." *Id.* at 33.

This argument is irrelevant and does not contend with this Court's decision in *Mock*. The new rule is, under the precedent set in *Mock*, a "legislative rule;" accordingly, it has the "force and effect of law." 75 F.4th at 578. As this Court said, the rule "functionally 'affect individual rights' and 'create[s] new law.' " *Id.* at 579.

Regardless of whether the three veterans had to register their firearms before the new rule went into effect, they have to now. If they do not, they can be prosecuted for a felony, and in those proceedings, the

courts will be bound by the rule. Additionally, the Bureau (for reasons unclear in the rule's plain text) estimates that basically every pistol with a stabilizing brace is subject to the rule, except for an undefined 1 percent. *Id.* at 574–75. If the Bureau cannot identify which firearms constitute this 1 percent—and it cannot—the veterans should not be expected to explain why they are not in the 1 percent. Indeed, the Bureau appears to be incentivized to keep this 1 percent unclear so that it can claim that some firearms are not subject to the rule while also effectively preventing anyone from (in its cynical view) finding an end-run around the rule. It seemingly does not want clarity—it wants gun owners and manufacturers to live in confusion and fear, which is itself an irreparable harm.

## B.    The district court correctly balanced the public interest and harms.

Relief is in the public interest. As this Court has said, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). Additionally, this Court has said that requiring an entity to follow the law is not a "burdensome thing." *See Hodgson v. First Fed. Sav. & Loan*

*Ass'n of Broward Cnty.*, 455 F.2d 818, 826 (5th Cir. 1972). The Bureau purports that the new rule is necessary to avoid confusion that supposedly predates the rule, but it does not explain how the rule is remedying that confusion. Bureau's Br., at 28.

## III. The district court in *Britto* appropriately exercised its discretion by issuing a stay.

In *Britto*, the district court stayed the effective date of the new rule under 5 U.S.C. § 705. Under § 705, the district court is authorized to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." This Court has expressed "strong[] doubt" that this language should be construed narrowly. *See All. for Hippocratic Med.*, 78 F.4th at 256. Notably, if the three veterans ultimately win, 5 U.S.C. § 706(2), a closely related statute, provides that the district court "shall . . . set aside" the new rule. *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 1 & n.1 (2023) (statement of Kavanaugh, J.) (quoting Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 1012–13 (2018)) (explaining the Administrative Procedures Act "expressly authorizes" vacatur, so "courts *do* hold the power" to "set aside" or "strike down" an administrative rule). Accordingly, vacatur is the "default rule."

*All. for Hippocratic Med.*, 78 F.4th at 255 (quoting *Cargill*, 57 F.4th at 472); *see also United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). Section 705 is merely a "temporary form of vacatur," which this Court has similarly favored. *See All. for Hippocratic Med.*, 78 F.4th at 254.

As a preliminary matter, a district court is constitutionally vested with the "judicial Power of the United States"—not the judicial power of some geographical portion thereof. U.S. Const. art. III, § 1; *see also Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) ("[T]he Constitution vests . . . [d]istrict [c]ourt[s] with 'the judicial Power of the United States.' That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction."). *See generally* Mila Sohoni, *The Lost History of the "Universal" Injunction*, 133 Harv. L. Rev. 920 (2020) (rebutting the myth that nationwide injunctions were invented by judicial activists in the 1960s).

The judicial power extends to "all Cases, in Law and Equity" arising under federal law. U.S. Const. art. III, § 2, cl. 1. Both stays and injunctions are forms of equitable relief, and in *Brown v. Board of*

*Education*, the United States Supreme Court recognized that "[t]raditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." 349 U.S. 294, 300 (1955).

Indeed, this Court has emphasized that in equity, a district court has "broad" remedial powers, reviewed under the deferential abuse of discretion standard. *Davis v. E. Baton Rouge Parish Sch. Bd.*, 721 F.2d 1425, 1439 (5th Cir. 1983); *see also Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality opinion) ("In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow.").

Equitable relief is supposed to be limited by the "nature" of the constitutional or statutory violation; however, this principle is not as limiting as it may seem. *See Milliken v. Bradley* (*Milliken I*), 418 U.S. 717, 750 (1974). As the United States Supreme Court has emphasized, "[t]he . . . principle . . . means simply that federal-court decrees must directly address and relate to the constitutional [or statutory] violation itself." *Milliken v. Bradley* (*Milliken II*), 433 U.S. 267, 281–82 (1977). Accordingly, a decree cannot be "aimed at eliminating a

condition that does not violate the . . . [law] or does not flow form such a violation;" however, "where . . . a . . . violation has been found, the remedy does not 'exceed' the violation if the remedy is tailored to cure the 'condition that offends [the law].' " *Id.* at 282 (quoting *Milliken I*, 418 U.S. at 738). Additionally, courts in equity favor "workable" relief. *See Lemon*, 411 U.S. at 200.

Turning to the stay issued in *Britto*, the district court used its broad remedial powers—specifically authorized by statute—to cure a violation of law. The stay "directly address[es] and relate[s]" to the violation—the new rule is illegal, and the stay effectively removes it from existence. *See Milliken II*, 433 U.S. at 281–82. The stay is not "aimed" at doing anything other than addressing the violation. *See id.* at 282. It is also "workable"— it is much easier to administer than a bunch of plaintiff-specific injunctions with various conditions. *See Lemon*, 411 U.S. at 200.

Additionally, while this Court has analogized stays to preliminary injunctions, it has made clear that a stay is not an injunction. *See All. for Hippocratic Med.*, 78 F.4th at 254. As this Court has held, a stay is "less drastic" because it does not "order the defendant to do anything." *Id.* at 254 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165

(2010)). Instead, it merely "removes the source of the defendant's authority." *Id.*; *Nken*, 556 U.S. at 428–29 ("[A] stay achieves [a] result by temporarily suspending the source of authority to act . . . not by directing an actor's conduct."). Accordingly, this Court has also held that "unlike with a preliminary injunction, a stay does not actively prohibit conduct, and so does not carry the same threat of contempt." *All. for Hippocratic Med.*, 78 F.4th at 254.

The Bureau's counterarguments appear largely premised on a misunderstanding of the principle that equitable relief is limited by the nature of the violation—a misunderstanding that would require the overruling of *Brown* to accept. *See* Bureau's Br., at 45. For example, it quotes the United States Supreme Court's decision in *Gill v. Whitford* for the proposition that a district court "may grant relief only to remedy 'the inadequacy that produced . . . injury.' " *Id.* at 44 (quoting *Gill v. Whitford*, 585 U.S. 48, 67 (2018)). Curiously, though, the Bureau uses a "quotation omitted" parenetical. *Id.*

The quote comes from *Lewis v. Casey*, a decision illustrating the principle. 518 U.S. 343 (1996). In *Lewis*, the district court purported that it was applying precedent that prisoners must have "*access to the courts.*"

*Id.* at 350. The district court issued a "25-page injunctive order" that "mandated sweeping changes" and "specified in minute detail" exactly what state prison officials had to do. *Id.* at 347. Effectively, the court created a new constitutional right to "a law library or legal assistance" and then began to supervise prison officials. *Id.* at 350. For example, it specified "the content of a videotaped-legal research course for inmates" and required all prison librarians to have "a library science degree, law degree, or paralegal degree." *Id.* at 347. After discussing the principle, the United States Supreme Court held that the district court erred by issuing an "intrusive" injunction that had the practical effect of creating a new right. *Id.* at 350, 362.

Nothing the United States Supreme Court said in *Lewis* indicates a repeal of the longstanding broad powers a district court has in equity. The remedy that the district court provided in *Britto*, a stay, bears a rationale basis to the nature of the legal violations—it does not, in effect, create any new rights (indeed, a stay cannot create anything new—it can only preserve the status quo).

The Bureau also discusses various purported policy concerns that have been noted in some separate writings. Bureau's Br., 46. For

example, the Bureau claims that stays "enable[] forum shopping." *Id.* If the Bureau does not like 5 U.S.C. § 705, it needs to take its concerns to Congress—these concerns having nothing to do with whether the district court abused its discretion and are not universally accepted.

## IV.  In *Texas Gun Rights*, the district court appropriately exercised its discretion.

In *Texas Gun Rights*, the district court preliminarily enjoined enforcement of the new rule against most members of the two associations based largely on the sworn declarations from the association officials. The Bureau appears to not like associational standing very much, repeatedly saying that the record is devoid of support for extending relief to these members. Bureau's Br., at 49. The Bureau can say "nothing in the record" supports the relief granted as much as it wants, but the Bureau has not even attempted to address the declarations that are actually in the record. No abuse of discretion has occurred.

## CONCLUSION

The new rule is invalid on numerous grounds and the decisions of the district court should be affirmed.

Dated: March 22, 2024.

Respectfully Submitted,

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

*/s/ Skylar Croy*

Skylar Croy
  *Attorney of Record*
Rick Esenberg
Daniel P. Lennington
Lucas T. Vebber
Skylar Croy
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Dan@will-law.org
Lucas@will-law.org
Skylar@will-law.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2024, I electronically filed this brief with the Clerk of Courts for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system; accordingly, the brief was served via CM/ECF on all counsel who are registered CM/ECF users.

Dated: March 22, 2024

*/s/ Skylar Croy*
Skylar Croy

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,992 words, including approximately 202 words in the picture on page 11, and excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rules of Appellate Procedure 32(a)(5) and Circuit Rule 32(b), and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because this brief has been prepared in a proportionately spaced typeface using the 2013 version of Microsoft Word in 14-point Century Schoolbook font.

Dated: March 22, 2024

*/s/ Skylar Croy*
Skylar Croy